# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 20-0703V
UNPUBLISHED

| | |
|---|---|
| JOY ADAMS,<br><br>    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: February 24, 2022<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Tetanus Diphtheria<br>acellular Pertussis (Tdap)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Injury (SIRVA) |

*John Robert Howie, Howie Law, PC, Dallas, TX,* for Petitioner.

*Andrew Henning, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On June 10, 2020, Joy Adams filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered from a shoulder injury related to vaccine administration ("SIRVA") as a result of a Tdap vaccine she received on June 11, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of $135,846.83, representing $123,000.00 for actual pain and suffering, $280.00 for past unreimbursed expenses, and $12,566.83 in lost wages.

---

[1] Although this Decision has been deemed unpublished, it will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.       Relevant Procedural History

Approximately 13 months after this case was initiated, Respondent filed his Rule 4(c) report on July 19, 2021, conceding that Petitioner was entitled to compensation. ECF No. 30. A ruling on entitlement was issued on July 19, 2021. ECF No. 31. After a period of negotiation, the parties were able to resolve only the amounts of lost wages and past unreimbursed out-of-pocket expenses to be paid to Petitioner. ECF No. 35. The parties accordingly filed briefs setting forth their respective positions on the disputed damages element. ECF Nos. 39 ("Br."), 40 ("Opp."), and 41 ("Repl."). I subsequently proposed that the parties be given the opportunity to argue their positions at a motions hearing, at which time I would decide the disputed damages issues. ECF. No. 42. That hearing was held on February 18, 2022,[3] and the case is now ripe for a determination.

## II.      Relevant Medical History

A complete recitation of the facts can be found in the Petition, the parties' respective pre-hearing briefs, and in Respondent's Rule 4(c) report.

In brief summary, Ms. Adams received the Tdap vaccine in her right shoulder on June 11, 2017 at the emergency room after suffering a laceration to her hand. Ex. 3 at 10-20. Three years prior to her vaccination, Petitioner had one minor complaint of muscular pain in her right shoulder. Ex. 1 at ¶3. Otherwise, Petitioner had no history of pain, inflammation, or dysfunction specific to her right shoulder. *See* Ex. 4. Eight days after her vaccination, Ms. Adams presented to a doctor for the removal of stitches to her hand. Ex. 12 at 16. At the appointment, she noted that her arm was warm to the touch at the injection site and complained of right shoulder pain severe enough to keep her up at night. *Id.* About a month later, on July 17, 2017, Ms. Adams presented to her primary care physician ("PCP") with continued complaints of right arm pain since her vaccination. Ex. 4 at 62. Ms. Adams was told to ice her shoulder and to return if she was still experiencing symptoms in 1-2 months. *Id*.

On August 28, 2017, Ms. Adams emailed her PCP asking for additional treatment options as she continued to have pain, as well as limited function, in her arm. Ex. 20 at 1. Her doctor suggested ice and over-the-counter NSAIDs, but no other treatment. *Id.* at 2, 4.

---

[3] At the end of the hearing held on February 18, 2022, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

2

On November 20, 2017, five months after her vaccination, Petitioner returned to her PCP with continued complaints of right shoulder pain. Ex. 4 at 68. The doctor noted that Ms. Adams was unable to lift her arm above her head. *Id.* He ordered an MRI and advised her to do cautious exercises. *Id.*

Ms. Adams was unable to have the ordered MRI for another approximately three months due to issues with her insurance coverage. Ex. 4 at 72. In the intervening time, she had xrays of her right shoulder, which were normal, and sought care from a chiropractor. Ex. 5 at 10-26, Ex. 6 at 141. The chiropractor found reduced strength and range of motion and diagnosed adhesive capsulitis. Ex. 5 at 14.

Petitioner's MRI on February 16, 2018 showed mild to moderate acromioclavicular arthrosis, a near full-thickness supraspinatus tear, and a large shoulder effusion. Ex. 6 at 201. Upon receiving the results, Ms. Adams' PCP referred her to an orthopedist. Ex. 7 at 8.

On April 16, 2018, Petitioner presented to orthopedist, Dr. Spencer. Ex. 7 at 8. Dr. Spencer found reduced range of motion, reduced strength, and pain. *Id.* He recommended that Petitioner have surgery to relieve her symptoms. *Id.* Petitioner elected to have the surgery, but needed time to get her financial circumstances in order due to the length of time she would be unable to work while she recovered. *Id.* Dr. Spencer administered a cortisone injection for pain relief in the interim. *Id.*

Petitioner underwent a right shoulder arthroscopy with limited debridement and acromioplasty, a medium-sized retracted rotator cuff tear repair, and an arthroscopic biceps tenodesis on August 9, 2018. Ex. 8 at 33.

One week after her surgery, Petitioner presented for an occupational therapy evaluation. Ex. 9 at 1. She continued to attend occupational therapy through December 21, 2018, attending a total of 25 sessions post-surgery. *Id*. at 4-35. At the time of her discharge, she had made progress, but still had soreness. *Id*. at 34. Petitioner stated that she had recovered about 75% of her previous function in her right shoulder. Ex. 19 at ¶19.

Ms. Adams had five post-surgical follow up appointments with Dr. Spencer, during which it was found that she was progressing, although slowly. Ex. 9 at 12-18. At her final appointment on May 14, 2019, Dr. Spencer noted that Ms. Adams' pain was minimal and she had better range of motion, although not full. *Id*. at 18. She was cleared to work without restriction. *Id.*

### III. The Parties' Arguments

#### a. Petitioner

Ms. Adams seeks an award in the total amount of $152,846.83 consisting of $140,000.00 as compensation for her pain and suffering, plus $280.00 for past unreimbursable medical expenses and $12,566.83 in lost wages. Br. at 1. The parties agree on the amounts for out-of-pocket expenses and lost wages, leaving actual pain and suffering the sole issue in contention. ECF No. 44.

Petitioner argues that her SIRVA injury caused her severe pain for a long period of time and required a significant surgical repair, with several separate procedures including debridement, rotator cuff tear repair, and tenodesis. Br. at 11-12. Further, Petitioner's injury, which was to her dominant arm, had a significant impact on her life. *Id*. at 44. Ms. Adams explained that she was unable to use her right arm for daily activities, like washing her hair or reaching for her phone, and impacted both of her jobs, which required the use of her arms for scanning merchandise, as well as for lifting, cooking, cleaning, and driving. *Id*. at 44-46. Petitioner's injury caused her to sleep in a recliner for more than a year. Repl. at 15.

Petitioner also stresses the length of her course of treatment, arguing that the gaps in treatment were due to factors unrelated to the severity of her pain and suffering, such as the failure of her doctors to quickly appreciate the severity of her SIRVA injury, her insurance company's initial refusal to cover an MRI, and her financial circumstances necessitating time for her to prepare for the time off work post-surgery. Repl. at 2.

During the hearing and in her brief, Petitioner discussed prior SIRVA cases that involved injured claimants with similar fact patterns, and thus argued that an award of $140,000.00 in pain and suffering was reasonable and appropriate given that her circumstances were comparable. Br. at 48-61.

#### b. Respondent

Respondent maintains that a pain and suffering award of $100,000.00 is appropriate, considering the scope and nature of Ms. Adams' injuries. Opp. at 1. Ms. Adam's medical records, Respondent contends, do not support her description of severe pain in the months after her vaccination. *Id*. Rather, Petitioner's pain was "manageable," rather than severe, and did not force her to seek "emergent or specialized treatment" or miss any work in the 14 months between her vaccination and her surgery. *Id.* at 2.

Respondent also distinguishes Petitioner's cited prior SIRVA cases, noting that in all of them the significant difference was the length of time each petitioner received treatment for his or her SIRVA. Opp. at 3. However, Respondent argues that the significant difference for Ms. Adams was the length of time between vaccination and surgery, a factor "dictated by how long Petitioner waited to have surgery," with directed treatment being delayed "until she saw an orthopedist roughly ten months post-vaccination." *Id*. at 3, 5. Because Petitioner was able to wait 14 months with only one steroid injection and no physical therapy, Respondent argues that her injury was less severe than those in the cases cited. *Id.* at 3.

During the hearing and in his brief, Respondent discussed prior SIRVA cases that involved injured claimants with similar fact patterns, and thus argued that an award of $100,000.00 in pain and suffering was reasonable and appropriate. Opp. at 3-5.

## IV.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### V.     Prior SIRVA Compensation Within SPU[5]

#### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2022, 2,371 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,306 of these cases, with the remaining 65 cases dismissed.

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

Of the compensated cases, 1,339 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 88 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[6]

1,223 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 967 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

---

[6] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[7] Agreement |
|---|---|---|---|---|
| **Total Cases** | *88* | *1,223* | *28* | *967* |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,950.73 | $70,000.00 | $90,000.00 | $42,500.00 |
| **Median** | **$95,974.09** | **$90,000.00** | **$122,886.42** | **$60,390.00** |
| **3rd Quartile** | $125,269.46 | $116,662.57 | $161,001.79 | $88,051.88 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.  Pain and Suffering Awards in Reasoned Decisions

In the 88 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $94,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these

---

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VI.     Appropriate Compensation in this SIRVA Case

### a. Awareness of Suffering

Awareness of suffering is not typically a disputed issue in cases involving SIRVA – and it does not appear to be herein either. Thus, based on the circumstances of this case, I find that Ms. Adams had full awareness of her suffering, and proceed to analyze the severity and duration of the injury.

### b. Severity and Duration of Pain and Suffering

With respect to the severity and duration of the injury, Ms. Adams's medical records and affidavits provide a description of moderate SIRVA injury. Petitioner sought treatment for her pain only eight days after her vaccination, following up twice over the next six weeks with continued complaints. Ex.12 at 16; Ex. 4 at 62-64; Ex. 20 at 1-4. Ms. Adams was advised to use ice and over-the-counter medications to treat her injury, and to follow up if her symptoms did not resolve. *Id.*

Four months later, Ms. Adams returned to her doctor with continued complaints of shoulder pain and reduced range of motion. Ex. 4 at 68. At that time, she was unable to raises her arm above her head. *Id*. Although an MRI was ordered, it remained unperformed for three more months due to issues with Ms. Adams's insurance. Ex. 4 at 68-72. Ms. Adams's February 16, 2018 MRI revealed a significant shoulder injury, including a near-full thickness rotator cuff tear and a large shoulder effusion. Ex. 6 at 201. Ms. Adams was immediately referred to an orthopedist, who recommended surgery after his first examination. Ex. 7 at 8. Petitioner underwent successful surgery 14 months after her vaccination. Ex. 8 at 33.

After her surgery, Petitioner was unable to work for several months due to her recovery. She attended 25 sessions of occupational therapy and five follow up appointments with her orthopedist. Ex. 9 at 1-35; Ex. 7 at 12-18.  Her total course of

treatment spanned 23 months, during which she consistently noted fairly high levels of pain.

Another factor to consider in awarding an amount for pain and suffering is the impact of an injury on one's employment and on the enjoyment of daily life activities. Ms. Adams noted difficulty performing her work duties of scanning groceries and caring for disabled adults, as well as difficulties with activities of daily living, including self-care tasks like washing her hair. Ex. 19 at ¶19-20. At the end of her course of treatment, Petitioner assessed herself at 75% recovered, stating that she continued to have difficulty lifting heavy items and reaching overhead. Ex. 19 at ¶19. Petitioner further states that she was no longer able to ride a bicycle or push a lawnmower. Id. at ¶20. I do note that Ms. Adams was cleared for all job duties without restriction. Ex. 9 at 18.

All of the above suggest that the appropriate award in this case is "above median" – and indeed neither side has requested that the pain and suffering award be less than $100,000.00.

After reviewing the record in this case and considering the parties' arguments during the hearing, I find that this is a significant, but overall moderate, SIRVA injury. Although both parties cited several good comparable prior SIRVA cases in both their filed briefs and during the oral argument, this case is most like *Nute v. Sec'y of Health & Human Servs.*, No. 18-140V, 2019 WL 6125008, *1 (Fed. Cl. Spec. Mstr. Sept. 9, 2019). In *Nute*, the petitioner was a nurse who was awarded $125,000 in pain and suffering for her vaccine-related SIRVA injury. The *Nute* petitioner had a course of treatment substantially similar to Ms. Adams's course, with no pre-surgery physical therapy, one MRI, a similar surgery, three post-surgery orthopedic appointments, and 19 post-surgery physical therapy sessions. *Id*. at *2-3. The *Nute* petitioner sought treatment five weeks after her vaccination and had three painful cortisone injections before her surgery. *Id.* Finally, the *Nute* petitioner was a nurse, with a job somewhat similar to Ms. Adams's job caring for disabled adults, and reported impacts on her activities of daily living similar to those of Ms. Adams. *Id*. at *1, 5. The degree of factual similarity between the course of the *Nute* petitioner and Ms. Adams's course suggest an award of pain and suffering in the same range (although I am allowing a lower award, in light of reasonable arguments made by Respondent about the overall moderate severity herein).

While Ms. Adams initially sought treatment quickly, her course of treatment in the months after her vaccination was conservative, with only ice and over-the counter medications. Although Petitioner argued that her injury significantly affected her daily functioning, she waited until approximately five months post-vaccination to seek more aggressive treatment. During that time, Petitioner complained of pain that prevented her from sleeping, but her pain was not such that she sought more urgent or aggressive care,

such as visiting an urgent care or emergency room. Although I credit Petitioner's arguments about the difficulty of her personal circumstances as the cause of the delay, I also recognize Respondent's arguments as to why this may not be the most severe SIRVA and take those into account in determining the slightly lower award of pain and suffering.

Under such circumstances and considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$123,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

### c. Award for Past Unreimbursed Expenses

Ms. Adams requests $280.00 in past unreimbursable expenses. Br. at 61. Respondent does not dispute this sum, and therefore Petitioner is awarded this sum without adjustment.

### d. Award for Lost Wages

Ms. Adams requests $12,566.82 in lost wages. Br. at 61. Respondent does not dispute this sum, and therefore Petitioner is awarded this sum without adjustment.

### VII.  CONCLUSION

In light of all of the above, the I award **Petitioner a lump sum payment of $135,846.83,** (representing $123,000.00 for Petitioner's actual pain and suffering, $12,566.83 in lost wages, and $280.00 for unreimbursable medical expenses) **in the form of a check payable to Petitioner, Joy Adams.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

s/Brian H. Corcoran<br>
Brian H. Corcoran<br>
Chief Special Master

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.